**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLEGHENY DESIGN MANAGEMENT, INC., ) ) ) Plaintiff, ) ) v. ) ) TRAVELERS INDEMNITY ) COMPANY OF AMERICA, ) ) Defendant. ) | 2:12-cv-00658-TFM |

**MEMORANDUM OPINION AND ORDER OF COURT**

Pending before the Court is the MOTION FOR SUMMARY JUDGMENT (ECF No. 25), with brief in support (ECF No. 26), filed by Defendant Travelers Indemnity Company of America ("Travelers"). Plaintiff Allegheny Design Management, Inc. ("ADM") filed a response in opposition (ECF No. 30); Travelers filed a reply brief (ECF No. 32). The motion has been fully briefed and the factual record has been thoroughly developed via the submission of the parties' concise statement of material facts (ECF Nos. 27, 29, 33) and the various appendices and exhibits (ECF Nos. 28, 31, 34). Accordingly, the motion is now ripe for disposition.

### I. BACKGROUND

The following background is taken from the Court's independent review of Travelers' motion, the filings in support and opposition thereto, and the record as a whole. Notably, the parties agree on the vast majority of the materials facts. All disputed facts and inferences have been resolved in the light most favorable to ADM, the non-moving party.

**A.    Factual Background**

Plaintiff ADM constructs retail establishments on behalf of national commercial businesses in shopping malls throughout the United States. Among its projects, ADM was a

general contractor in building a Finish Line retail store inside the Fashion Show Mall in Las Vegas, Nevada. Defendant Travelers issued a Commercial General Liability Insurance Policy to ADM in connection with its general contractor responsibilities.

As part of the project, ADM entered into a General Contractor Agreement with Finish Line.[1] Section 4.1 of the contract provides that "the Work to be performed at the Site is included in the Contract Documents and specified in [the] Owner's General Contractor Bid Form." (ECF No. 28-3 at 7). The General Contractor Bid Form lists "Final Cleaning" as part of the "General Requirements" for the Finish Line Project.

ADM also entered into two subcontracts in connection with the Finish Line Project. First, ADM entered into a subcontract with Elite Glass and Mirrors, Inc. ("Elite") to provide materials and labor for the installation of all glass required by the project. Second, ADM entered into a subcontract with Gold Star Cleaning Company ("Gold Star") for the final cleaning of the glass within the store.

In accordance with the subcontract, Elite accepted delivery of the glass and began its work. ADM Superintendent Karl Wilhelm ("Wilhelm") was on site to supervise the entire build-out and inspect Elite's work. Elite completed installation of the glass two to three days later. Throughout the delivery and installation process, Elite did not convey to ADM that the glass was defective in any way.[2]

On October 23, 2011, Gold Star began cleaning the newly installed glass.[3] At some time that day, a Gold Star representative noticed that the glass was damaged and notified Wilhelm that

---

1. Travelers submits this document as Exhibit 3 in the Appendix to its Motion for Summary Judgment. The document is signed by ADM President John Kuruc, but not by a representative for Finish Line.
2. Charles Dycus, President of Elite, testified that he did not notice any problems with the glass when he inspected it on the delivery truck or at any time during the installation. ECF No. 28-12 at 3.
3. There are some discrepancies between the dates set forth in the Complaint and those in the Defendant's Concise Statement of Material Facts ("CSMF"). The dates outlined in the CSMF by Travelers and admitted to by ADM are used for purposes of this Opinion unless otherwise noted.

there was one long scratch. Wilhelm inspected the glass and confirmed the scratch; however, he later testified that there were also other scratches which he was unable to see upon his initial examination due to a barricade which impeded his view. At Wilhelm's instruction, Gold Star continued to clean the glass.[4] Although it remains unclear exactly when the glass was damaged, the parties agree that the damage to the glass took place before Gold Star finished cleaning. The parties are also in apparent agreement that either Gold Star or Elite caused the damage.

Fashion Show Mall Manager Marcus Wilcher ("Wilcher") also notified Wilhelm of the damaged glass the next morning. Two days later, on October 26, 2012, the Finish Line store opened for business. Wilcher also issued a "punch list" for the Finish Line store on October 27, 2011, which indicated that the glass work was not accepted, stating that the "glass has many small scratches." (ECF No. 28-5).

The record is somewhat imprecise as to when exactly ADM's work was considered to have been complete. The "General Contractor Agreement" between ADM and Finish Line provided that "Contractor shall be deemed to have completed a Project when Contractor completes, submits and Owner accepts, the Final Application for Payment as set forth in the Payment Checklist (PD-3) in the Construction Process Manual." (ECF No. 28-3 at 11). The Concise Statement of Material Facts ("CSMF") filed by Travelers states, and ADM admits, that "ADM's work was not completed until the scratches in the glass were addressed;" that "ADM's work under its contract with Finish Line was not completed until Gold Star returned to address the scratches on the glass identified in the punch list," and that "ADM's work for Finish Line would not have been considered until Finish Line signed off on the punch list, which was

---

4. By letter dated November 14, 2011, Gold Star's Owner Arcides Gellert stated that "[d]amages to the glass were noticed prior to rendering clean up services to the property in discussion; such damages were immediately reported to the superintendent, Karl Wilhelm, who not only disregarded our intent to stop our services but requested himself that we finish the services with caution as he would contact the glass installing company to notify [sic] the imperfection." ECF No 28-9.

October 27, 2011, at the earliest, and therefore after the damage to the glass occurred." (ECF No. 27 at 11-12, ¶¶ 40, 42, 43). The parties also agree that Gold Star returned to the Finish Line site at some point after the punch list to "complete work that was pursuant to [its] contract." (ECF No. 27 at 11, ¶ 42).

ADM later obtained a bid to repair the glass but never had it replaced. As ADM President Kuruc testified, the glass was never replaced "because once we were notified that there was an issue, we contacted our representative for our insurance carrier to let them battle it out." (ECF No. 28-13 at 5).

ADM submitted a claim to Travelers on October 31, 2011 in which it sought coverage for the damaged glass under the insurance policy. By letter dated January 6, 2012, Travelers denied ADM's claim on the ground that the damage to the glass did not meet the definition of "products-completed operations hazards." (ECF No. 28-10 at 2-5). Travelers also cited various exclusions that likewise precluded coverage.

Finish Line has not brought suit against ADM for damages related to the glass or made a formal claim to ADM. Kuruc did, however, testify that Finish Line's legal department asserted that ADM is obligated to pay for the damages to the glass. That assertion was apparently made during a telephone call, and Kuruc had received nothing in writing as of the date of his deposition.

**B.    Procedural History**

ADM commenced this action on May 15, 2012 by filing a three-count Complaint in Court of Common Pleas of Armstrong County, in which it set forth claims for (1) breach of contract, (2) declaratory judgment, and (3) bad faith against Travelers. Travelers timely removed

4

the case to this Court on May 15, 2012 and filed the instant motion for summary judgment on April 12, 2013.

## II. STANDARD OF REVIEW

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, the non-movant must show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III. DISCUSSION

All parties agree that Pennsylvania law applies to this diversity action. Under Pennsylvania law, the interpretation of the insurance policy is a question of law properly decided by the Court. *Scottsdale Ins. Co. v. City of Easton*, 379 F. App'x 139, 143 (3d Cir. 2010) (citing *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999); *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). "The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 170 (Pa. 2005) (citations omitted). *See*

5

*McMillen Eng'g, Inc. v. Travelers Indem. Co.*, 744 F. Supp. 2d 416, 423-25 (W.D. Pa. 2010) (setting forth the rules of insurance contract interpretation under Pennsylvania law) (citations omitted).

When the language of the policy is clear and unambiguous, the Court must give effect to that language. *Id.* Alternatively, "when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contracts prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage." *Id.* A court will deem contractual language ambiguous if "'it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). "'This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one interpretation when applied to a particular set of facts." *Washington Energy Co. v. Century Sur. Co.,* 407 F. Supp. 2d 680, 689 (W.D. Pa. 2005) (quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

The insured "bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citation omitted). Should the insured meet that burden, "the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." *Id.*

**A. Breach of Contract & Declaratory Judgment**

ADM avers a breach of contract claim at Count One and seeks declaratory judgment at Count Two. The two counts are somewhat duplicative, as pleaded. At Count One, ADM alleges that Travelers has breached its insurance contract with ADM by disclaiming coverage and by

failing to indemnify Plaintiff from and against any and all liability arising out of the property damage. At Count Two, ADM seeks a declaration that coverage for the cost of repairing or replacing the glass at the Finish Line project site exists under the policy and that Travelers must indemnify Plaintiff from and against any and all liability arising out of the property damage.

Travelers moves for summary judgment on both counts in which it sets forth numerous bases for denying coverage. Specifically, Travelers argues that the damage does not constitute a covered "occurrence," that two exclusions otherwise apply, and that the duty to indemnify has not been triggered. The Court will address these contentions seriatim.

### 1. Coverage for an "Occurrence"

The "Insuring Agreement" portion of the policy provides, in pertinent part, that "[Travelers] will pay those sums that the insured becomes legally obligated to pay as damages because of 'property damage' to which the insurance applies." ECF No. 28-1 at 8. The policy also states that it applies to "property damage" that takes place during the covered period and which is caused by an "occurrence." An "occurrence" is defined as either an "accident, including continuous or repeated exposure to substantially the same general harmful conditions" *or* "an act or omission, including all related acts or omissions, that causes 'subcontracted work property damage.'" (ECF No. 28-1 at 24). The parties dispute both of these alternative bases for coverage.

#### a. "Accident"

The term "accident," unlike "subcontracted work property damage," is not expressly defined in the policy. In the absence of a definition, "[w]ords of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). The

Supreme Court of Pennsylvania has consulted the dictionary definition of "accident" to determine the ordinary usage of that term in this context: "'[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'" *Id i*at 897-98 (quoting Webster's II New College Dictionary 6 (2001)). Relevant here, the *Kvaerner* Court also made abundantly clear that the "definition of 'accident' required to establish an 'occurrence' under [commercial general liability] policies cannot be satisfied by claims based upon faulty workmanship." *Kvaerner*, 908 A.2d at 899 (Pa. 2006). *See also id.* at 900 ("To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.").

The parties' dispute focuses on whether the damage occurred due to an accident or faulty workmanship, but they both operate under the notion that either Elite or Gold Star caused the scratches. Travelers highlights that "ADM has set forth no evidence that the damage to the glass at the Finish Line was due to anything else but faulty work."[5] (ECF No. 26 at 12). Travelers does not, however, assign fault to one subcontractor over the other. ADM's position is that "faulty workmanship would apply to how the glass was installed, not how it was cleaned." (ECF No. 30 at 5). Put differently, ADM submits that "cleaning does not entail any level of workmanship.'" *Id.* The Court does not agree.

The factual predicate offered by ADM—that the "scratches [were] put into the surface of the glass while being cleaned"—would constitute "faulty workmanship" when the definition of that term is applied. (ECF No. 30 at 5). The term "workmanship" is defined as: "1. [t]he art, skill, or technique of a workman; 2. [t]he quality of such art, skill, or technique; 3. [t]hat which is

---

5. Travelers also submits that the only explanation given with regard to how the damage occurred was set forth by Elite Glass Owner Charles Dycus. Dycus apparently testified that "leftover group remained on the glass, and was subsequently rubbed into the glass by Gold Star during cleaning." (ECF No. 26 (citing Ex. 12 at 12)). Exhibit 12 does not contain that portion of his alleged testimony.

produced by a workman; [or] 4. [t]he product of effort or endeavor." American Heritage Dictionary 1475 (1981). The manner in which Gold Star completed its subcontracted responsibilities certainly would qualify as a skill or technique of a workman, and Gold Star's performance of its glass cleaning services is no less the product of workmanship because the level of skill perhaps differs from construction or repair. Thus, based upon the undisputed facts, the Court concludes that the claim cannot fall within the policy's grant of coverage for an "accident."

### b. "Subcontracted Work Property Damage"

The alternative grant of coverage under the definition of "occurrence" is for "subcontracted work property damage." "Subcontracted work property damage" is defined in the policy to mean "property damage" that:

a. Is neither expected nor intended from the standpoint of the insured; and

b. Is to "your work" arising out of it or any part of it and included in the "products-completed operations hazard" if the work out of which the damage arises was performed on your behalf by a subcontractor. "Subcontracted work property damage" does not include "property damage" to the work out of which the damage described above arises.

(ECF No. 28-1 at 24). "Your work" means "(1) [w]ork or operations performed by you or on your behalf;" and "(2) [m]aterials, parts or equipment furnished in connection with such work or operations." (ECF No. 28-1 at 22). There is no dispute that the damage falls within the ambit of section (a) or that the subcontractors' labor qualifies as "your work." The focus of the parties' dispute at this juncture instead concerns the exceptions to what property damage is otherwise covered as a "products-completed operations hazard."

The definition of "products-completed operations hazard" as set forth in the policy provides that it:

> A. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" *except*:
>
> (1) Products that are still in your physical possession; or
>
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
>     a. When all of the work called for in your contract has been completed.
>
>     b. When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
>     c. When that part of the work done at a job site has been put its intended use by any person or organization other than another contractor or sub-contractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as complete.

(ECF No. 28-1 at 21-22) (emphasis added). Travelers initially relies only on subsection (a) and frames the issue on that basis: "whether the damage to the glass, which was the work of ADM's subcontractors, occurred before all work required by the ADM Contract [with Finish Line] had been completed." (ECF No. 26 at 9).

Travelers submits that the undisputed material facts show that the glass was scratched before ADM's work was completed—thus falling outside of the scope of the coverage—because the "Final Cleaning" was part of the work to be completed under the Finish Line contract and the damage occurred before Gold Star finished the subcontracted cleaning job. Travelers also contends that the disagreement over whether the glass was damaged before or during the work performed by Gold Star is not material because, in either event, the property damage occurred before the work called for in the Finish Line contract had been completed.

ADM relies on subsection (c) in its attempt to show that the work was considered "completed" at the time the damage occurred. To that end, ADM contends that "Finish Line had

started putting the property to its intended use at the time the damage was caused" because it "was moving into the store and had taken possession of the premises." (ECF No. 30 at 4). As support for these factual contentions, ADM submits a copy of an e-mail from Wilhelm to Larry Tarosky dated February 6, 2012 in which someone had handwritten the following in the blank space on the bottom one-half of the printout:

> 10:00 AM MARCOS MALL → WILCHER→ CALLED OR STOPPED / KARL FINE SWIRL SCRATCHES
>
> FINAL INSPECTION BUILDING FINAL 10/21
>
> FINISH LINE TOOK STORE / STOCKING / MADE PICKS STOCKING ON 10/23
>
> PICK STOREFRONT. 10/25 BARRICADE REMOVED.
>
> STORE TO OPEN ON 10/26.

(ECF No. 31-2 at 1). ADM also contends that the cleaning of the glass "was nothing more than a maintenance or service [ ] following the actual installation of such glass." *Id.* Thus, as ADM reasons, that portion of the project was completed at the time the damage occurred.

In reply, Travelers argues that the handwritten notes were not properly made part of the summary judgment record and that ADM distorts the contractual language in subsection (c). Travelers submits that even if ADM had submitted competent evidence of when Finish Line "took possession," that is not the relevant inquiry under the policy to determine the earliest point at which your work has been completed; rather, Travelers submit that the "inquiry to determine the earliest point at which 'your work' has been completed is ***when that part of the work done at the job site has been put to its intended use.***" (ECF No. 32 at 2) (emphasis in original). *See also id.* at 3 ("It is irrelevant whether, as Plaintiff argues, Finish Line had started 'putting its *property* to its intended use;' the question is whether the glass had been put to its intended use before the damage occurred.") (emphasis in original). From the perspective of Travelers, the

11

emphasized policy language is a clear reference to the particular work that is the subject of the subcontract(s) at issue: the installation and cleaning of the glass. Travelers thus submits it is immaterial if other aspects of ADM's overall project had been put to use (*e.g.*, the shelves it constructed being stocked) because the policy does not say that work is complete when any part of the work has been put to use. Travelers ultimately surmises that the earliest point at which the subcontracted work was put to its intended use would have been the date the store opened, which is at least three days after the damage to the glass occurred.

The Court finds that the position offered by Travelers is consistent with the policy language in subsections (a) and (c). Based upon the undisputed facts, all of the work called for in the Finish Line contract had not yet been completed. The damage to the glass was first reported on October 23, 2011; the earliest that all of the work could have been deemed complete was October 27, 2011, the date Finish Line signed off on the punch list. The question of whether the damage occurred before "that part of the work done . . . had been put its intended use" is a closer call, but the Court agrees with Travelers that the logical conclusion would be the date that the store opened for business—two days after the damage was first noticed. Accordingly, the Court concludes that work had not been completed under the definition of "subcontracted work property damage."

### 2. Exclusions to Coverage

The policy also contains numerous exclusions that operate to bar insurance coverage when applicable. Travelers relies on two of the so-called business risk exclusions. First, Exclusion j(5) provides that the insurance does not apply to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations."

(ECF No. 28-1 at 11). Second, Exclusion j(6) provides that the insurance does not apply to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." *Id.* This second exclusion does not apply to "property damage" included in the "products-completed operations hazard."

The Court finds that both exclusions should apply. Exclusion j(5) precludes coverage for damage to the glass on which ADM or its subcontractors were performing operations if the property damage arose out of those operations. Although the record is not precise as to when the damage actually occurred, the undisputed record and the parties' positions are consistent that either Elite or Gold Star caused the scratches. *See, e.g.*, ECF No. 1-1 at 5, ¶ 26 ("Moreover, the damaged work or work out of which the damage arises was performed by a subcontractor, to wit, Elite . . . ."). This exclusion would apply even if the Court adopted ADM's interpretation of the policy and accepted the unsupported exhibit with the handwritten notes to conclude that the work had been put to its intended use because Finish Line "took possession of the store on October 21, 2011." This exclusion would also apply if the Court ignored the definition of "workmanship" and construed the damage as an "accident." Exclusion j(6) would also operate to exclude coverage because, through this lawsuit, ADM seeks coverage for the cost of repairing or replacing the glass damaged by faulty work done on its behalf.

### 3. Indemnification

The policy provides that "[Travelers] will pay those sums that the insured becomes legally obligated to pay as damages because of 'property damage' to which the insurance applies. [Travelers] will have the right and duty to defend the insured against any 'suit' seeking those damages . . . [Travelers] may, at [its] discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." ECF No. 28-1 at 8. The policy defines a "suit" as "a civil

proceeding in which damages because of . . . "property damage" . . . to which this insurance applies are alleged." *Id.* at 22. A "suit" also includes (a) "[a]n arbitration proceeding in which such damages are claimed and to which the insured must submit or does not submit with [Traveler's] consent;" or (b) [a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with [Traveler's] consent." *Id.*

Under Pennsylvania law, an insurer has a duty to defend its insured if the complaint filed by an injured party potentially comes within the policy's coverage. *See Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) (citation omitted); *see also Kvaerner*, 908 A.2d at 896 ("[A]n insurer's duties under an insurance policy are triggered by the language of the complaint against the insured."). "The duty to defend is a distinct obligation, different from and broader than the duty to indemnify," *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) (citing *Erie Ins. Exch. v. Muff*, 851 A.2d 919, 925 (2004)), but "[a] finding that the duty to defend is not present will preclude a duty to indemnify, *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 596 n.3 (3d Cir. 2009) (citing *Kvaerner*, 908 A.2d at 896 n.7).

The Court finds that Travelers does not have a duty to defend ADM in the absence of a "suit" and that there is no duty to indemnify. ADM forthrightly admits that no formal claim has been made on ADM by Finish Line, but submits that the demand by Finish Line gives rise to a duty under the policy. This position disregards the plain language of the policy. The term "suit" is expressly defined to mean any civil action or other proceeding which seeks damages from the insured. Neither event has yet occurred. Aside from the absence of an underlying lawsuit, there is also no record evidence that ADM has otherwise been held liable for the damaged glass in any amount to trigger indemnification.

14

The Court will, therefore, will grant summary judgment to Travelers on Counts One and Two in their entirety. ADM is not entitled to coverage, and there has been no breach of contract. The only Count that remains is the bad faith claim.

### B. Bad Faith

Pennsylvania law is clear that a party which seeks to prove a bad faith claim must establish by clear and convincing evidence that the insurance company acted in bad faith without a reasonable basis for denying the claim, and that it knowingly or recklessly disregarded its lack of a reasonable basis to do so. *See W.V. Realty Inc. v. Northern Ins. Co.*, 334 F.3d 306, 312 (3d Cir. 2003). Where, as here, there is no coverage under an insurance policy, an insurer cannot be found to have acted in bad faith for denying coverage. *See Frog, Switch & Mfg. Co., Inc.*, 193 F.3d at 750, 751 n.9. Accordingly, Travelers is entitled to summary judgment on ADM's bad faith claim.

### IV. CONCLUSION

For the reasons hereinabove stated, the Court will grant the motion for summary judgment. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALLEGHENY DESIGN MANAGEMENT, INC.,** )<br>)<br>) | |
| **Plaintiff,** )<br>) | |
| v. ) | 2:12-cv-00658-TFM |
| ) | |
| **TRAVELERS INDEMNITY COMPANY OF AMERICA,** )<br>)<br>) | |
| **Defendant.** ) | |

## ORDER OF COURT

**AND NOW,** this 25th day of September, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 25) filed by Defendant Travelers Indemnity Company of America is **GRANTED**. The Clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:   **Michael E. DeMatt**
       Email: mdematt@bwc-law.com

       **Alan S. Miller**
       Email: amiller@psmn.com
       **Robert M. Palumbi**
       Email: rpalumbi@psmn.com